## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

| | | |
|---|---|---|
| KATIE WAGNER | : | |
| 217 Mountain Street | : | |
| Philadelphia, PA 19148 | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | No.: _____ |
| | : | |
| v. | : | |
| | : | |
| IKEA NORTH AMERICAN SERVICES, LLC | : | **JURY TRIAL DEMANDED** |
| d/b/a IKEA | : | |
| 420 Alan Road | : | |
| Conshohocken, PA 19428 | : | |
| | : | |
| Defendant. | : | |

---

## CIVIL ACTION COMPLAINT

Katie Wagner (*hereinafter* referred to as "Plaintiff," unless indicated otherwise) by and through her undersigned counsel, hereby avers as follows:

## INTRODUCTION

1.      Plaintiff has initiated this action to redress violations by Defendant Ikea North American Services, LLC (*hereinafter* referred to as "Defendant") of Title VII of the Civil Rights Act of 1964 ("Title VII" – 42 U.S.C. §§ 2000(d) *et. seq*), the Age Discrimination in Employment Act ("ADEA" - 29 U.S.C. §§ 621 *et. seq.*), the Americans with Disabilities Act, as Amended ("ADA" – 42 U.S.C. §§ 12101 *et. seq.*), and the Pennsylvania Human Relations Act ("PHRA").[1] As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

---

[1] Plaintiff's claims under the PHRA are referenced herein for notice purposes.  She is required to wait 1 full year before initiating a lawsuit from date of dual-filing with the EEOC.  Plaintiff must however file this lawsuit in advance of same because of the date of issuance of her federal right-to-sue-letter under Title VII, the ADEA and the ADA.  Plaintiff's PHRA claims however will mirror identically her federal claims under Title VII, ADEA and the ADA.

**JURISDICTION AND VENUE**

2.      This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal laws.  There lies supplemental jurisdiction over Plaintiff's state law claims because they arise out of the same common nucleus of operative facts as Plaintiff's federal claims asserted herein.

3.      This Court may properly assert personal jurisdiction over Defendants because their contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny.

4.      Pursuant to 28 U.S.C. § 1391(b)(1) an (b)(2), venue is properly laid in this district because Defendants are deemed to reside where they are subjected to personal jurisdiction, rendering Defendants residents of the Eastern District of Pennsylvania.

5.      Plaintiff is proceeding herein under Title VII and the ADA after properly exhausting all administrative remedies with respect to such claims by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and by filing the instant lawsuit within ninety ("90") days of receiving a notice of dismissal and/or right to sue letter from the EEOC.

**PARTIES**

6.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7.      Plaintiff is an adult individual with an address as set forth in the caption.

2

8.      Defendant Ikea North American Services LLC operates store locations nationally doing business as "IKEA" (selling home-furnishing(s) and other related products) and is headquartered in Conshohocken, Pennsylvania.

9.      At all times relevant herein, Defendant acted by and through their agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for the Defendants.

## FACTUAL BACKGROUND

10.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

11.     Plaintiff is a female.

12.     Plaintiff was hired by Defendant on or about March 19, 2017 as Recruiter and formally promoted to the position of Recruitment Delivery Manager.

13.     At all times, Plaintiff was based out of Defendant's United States headquarters, which was their Conshohocken, PA location (address set forth in the Caption).

14.     In total, Plaintiff was employed by Defendant for approximately 3.5 years until her illegal termination, *infra*.

15.     As a Recruitment Delivery Manager, Plaintiff worked within Defendant's Human Resources Department supervising a group of direct reports in the "Talent Department," in all aspects of recruitment/hiring/retention.

16.     For nearly the entirety of Plaintiff's employment, she directly reported to Eleanor Tattar, Vice President of Succession Planning/Talent Manager.

17.     At all relevant times, Tattar directly reported to Philip Wellington, "Head of People" (Chief Human Resources Officer)("CHRO") for the United States.[2]

---

[2] Mr. Wellington at all times reported to Defendant's President (US), one Javier Quinones.

18.     During Plaintiff's employment, she was a hard working employee who performed her job well, received positive feedback and had positive performance reviews.

19.     During Plaintiff's employment, she had not been the subject of any discipline, and never received so much as a "counseling" under Defendant's corrective action policy (as Defendant IKEA very much adheres to progressive discipline in coaching its employees, and same starts with a counseling, warning and up through final warning).

20.     The events giving rise to this lawsuit relate to Defendant's hiring of a male Recruitment Manager: Richard ("Rick") Carsley (*hereinafter* "Carsley") and his creation of a hostile work environment based upon sex and other discriminatory behaviors, which were formally reported to management by Plaintiff and others.

21.     During the last approximate year of Plaintiff's employment, Carsley was hired to perform similar recruiting functions as Plaintiff and was considered her peer, and was also overseeing his own team of direct reports.

22.     Though Carsley was brought on board in the same capacity as Plaintiff, working in their corporate US Headquarters performing formal human resources and recruiting/hiring functions – he objectively had no regard for civil rights laws which prohibit discrimination in hiring or terms and condition of employment based upon one's sex, age, pregnancy or other protected characteristics.

23.     Carsley's discriminatory behavior was uninhibited, and often made Plaintiff and other employees extremely uncomfortable working around him.

24.     Plaintiff confided concerns about Carsley's behavior to her direct supervisor (Tattar) on several occasions, and always assumed and hoped Tattar was addressing Carsley's inappropriate behavior either with him directly, through the appropriate chain of command/channels within Defendant – or both (in fact, Plaintiff perceived Tattar to be a strong

4

leader who held managers within Defendant Ikea's organization accountable in all aspects of job performance and company credo: shared values and unique culture).

25.     On or about June 2, 2020, Tattar was placed on an involuntary leave, pending an "investigation"; Plaintiff was    not privy to the details of the "investigation" concerning Tattar.

26.     On or about June 8, 2020, Plaintiff was interviewed as to the Tattar investigation.

27.     The context of the questioning related to: (1) Tattar's management style; (2) Tattar's communication(s) in or out of work with Plaintiff or other employees; and (3) whether Tattar communicated about other employees, such as Carsley.

28.     In light of Carsley's name having been mentioned, Plaintiff used the interview to convey her own very serious concerns about Carsley. In particular, Plaintiff outlined numerous sexist comments (and gestures) by him and that he engaged inappropriately in commentary and/or actions of discriminating against older job applicants and women (among others).

29.     Plaintiff therefore engaged in legally-protected complaints of discrimination on or about June 8, 2020 about Carsley when she was being interviewed about Tattar, concerns which Plaintiff understood were being conveyed to upper management.

30.     During Tattar's absence, Carsley (despite being a serious focal point in that investigation, as raised by Plaintiff), was actively assuming additional leadership roles, including all things Talent Acquisition, now joining senior leadership team meetings, making high-level decisions and announcing internal items to other parts of the Ikea organization across the United States -- before all local team members (including Plaintiff) were even on board with/aware of certain items.

31.     In addition, though employees including Plaintiff had been directed not to discuss the Tattar investigation or communicate with Tattar, Carsley was openly disparaging Tattar, including her leadership style (which Plaintiff brought to Philip Wellington's attention directly);

Mr. Wellington never followed up with Plaintiff nor confirmed whether he had so much as spoken with Carsley about this behavior, let alone admonished him for same.

32.     It was objective to most team members that Carsley and Mr. Wellington had a close relationship and that Mr. Wellington tended to favor Carsley over other managers when engaging in work-related issues (which likely speaks to why Wellington turned a blind eye to Carsley's discrimination and internal complaints about Carsley).

33.     As Carsley's discriminatory conduct had gone unabated, by early July 2020, an external candidate actually made a complaint of race discrimination against Carsley and one of his direct reports about their recruitment practices/hiring; same was forwarded directly to upper management and Plaintiff was never made aware that any action was taken in response to this complaint.  (Therefore, in addition to Plaintiff's own internal complaints of discrimination against Carsley, a new complaint from a member of the public had corroborated same by this time).

34.     On or about July 14, 2020, Plaintiff learned that Tattar's employment was terminated.

35.     On the same day of Tattar's announced termination, Plaintiff communicated with Amy Vernon (an HR Business Partner) advising that: (1) the discrimination claims she raised concerning Carsley had not been addressed; (2) Plaintiff was actually fearful of retaliation against herself; and (3) Plaintiff had been coping with depression (and the workplace stressors and being around Carsley were exacerbating same).

36.     Vernon asked Plaintiff what kind of "support system" she had for her depression and suggested she could offer company resources if need be (Plaintiff confirmed she did have support and confirmed she was undergoing treatment for her depression).

37.     Plaintiff inquired during the meeting if she was now permitted to speak to Tattar (as the investigation had concluded and Tattar no longer worked there); Vernon was very clear

6

that while she could not control who Plaintiff talked to – if Plaintiff was intent on speaking to Tattar about anything at all work-related, there would be problems.[3]

38.    Plaintiff's meeting with Vernon concluded with Vernon expressly informing Plaintiff she would "follow up" with Mr. Wellington "about the discrimination piece," Plaintiff had re-raised; however, Plaintiff had little confidence that following up with Mr. Wellington would do much, as Wellington had done nothing with any other concerns Plaintiff had brought to his attention about and concerning Carsley.

39.    On or about July 15, 2020, Plaintiff submitted a formal written complaint about and concerning Carsley through an internal complaint forum called "iSpeak." "iSpeak" is an on-line system (and form submission) available to employees of Defendant to make work-related complaints about any matters, inclusive of discrimination.

40.    The types of concerns Plaintiff expressed (more in depth) on this date overlapped many prior concerns: (a) previously expressed to Tattar; (b) expressed on or about June 8, 2020; and (c) expressed on or about July 14, 2020.  Some examples of such concerns included but were not limited to Carsley:

- Engaging in gender / age discrimination;

- Suggesting not to place a pregnant woman because she will be out on leave soon causing others to pick up her work obligations;

- Suggesting a female looked too big because she was pregnant in a training video and to remove her, inserting a black person;

- Comments about Plaintif's appearance, liking her outfit, and referencing her as cute;

- Recruitment teams consist of high heels click[ing] down the hall;

- Expressing difficulties in hiring with a reference to older women;

---

[3] Though Plaintiff did not socialize with Tattar outside of work, she still perceived Tattar to be an excellent manager and was concerned about Tattar's well being given the abrupt termination; however, given the company's clear animus toward this former employee, Plaintiff did not make any contact with Tattar as she was told.

- Comments about women being too emotional; and

- Considering whether women have family obligations when interviewing them;

The bullet-point examples above are not intended to be an all-inclusive list; but rather, just that - - a series of examples *of the types* of continual or pervasive comments made by Carsley that Plaintiffs and others found inappropriate and point-blank discriminatory.[4]

41.     The very next day -- on July 16, 2020, Plaintiff was contacted by Emily Wellington (People & Culture Business Partner) and Phillip Wellington (collectively "the Wellingtons"); for the first time, Plaintiff was told that she was now under investigation. Plaintiff was then placed on an involuntary leave of absence. The only information Plaintiff was provided was that: (1) she was not permitted to record the call (requiring her verbal confirmation of non-recording); (2) an employee complained about Plaintiff; (3) no timeframe for her involuntarily leave could be given; and (4) while Plaintiff's iSpeak complaint was received, this discrimination complaint had nothing to do with her now being sent home.

42.     Nonetheless, Plaintiff's involuntary leave of absence (for the first time in her career) happened to occur following at least 3 separate complaints of discrimination by Plaintiff, including twice in the prior 48 hours.

43.     On or about July 22, 2020, counsel from an outside law firm (Potter & Murdock, P.C.) interviewed Plaintiff as part of the "investigation" into Plaintiff. Therein, they asked Plaintiff about whether she has had contact with Tattar or an employee on paternity leave. The conversation then shifted into her own concerns of discrimination as relayed via iSpeak. Plaintiff reiterated prior concerns, explained that she had to escalate the matters through iSpeak because nothing was being

---

[4] There is also evidence that Carsley said "recruiting was like seducing a woman."

done by management about her prior concerns, and that she wanted the discrimination in the workplace to cease.

44.      During this interview, Plaintiff was given no meaningful information about alleged complaints about Plaintiff *purportedly* prompting a necessary investigation.

45.      Plaintiff participated in a scheduled conference call with Phillip Wellington on August 11, 2020 (per notification 1 day earlier). Therein, Tanesha Carter (acting as interim Manager since Tattar's separation) also participated in the call.

46.      During the August 11, 2020 call, Plaintiff was informed the investigation is still ongoing, the company is prepared to bring her back, and she should take her return as a "good sign."

47.      On August 12, 2020, Plaintiff returned to work and was instructed by Emily Wellington not to discuss certain aspects of prior investigations; though she was back    at work, Plaintiff did not even have access to her computer or Defendant's internal system until later in the day on August 12, 2020.

48.      Plaintiff then only had the opportunity to work for 2 more business days (Thursday, the 13th, and Friday, the 14th) before being terminated on Monday, August 17, 2020.

49.      Plaintiff was terminated via phone by Phillip Wellington (present with Emily Wellington) stating *inter alia*:

- The company has decided to separate Plaintiff's employment immediately;

- There are unsustainable working dynamics;

- It's in the best interest of the talent team to make a change;

- A "corrective action" will be sent to Plaintiff;

- No reason for termination would be given over the phone beyond stating "we have the ability to terminate at will, and there doesn't have to be a reason;" and

- Plaintiff's unused PTO will be paid out.

50.     Following the aforesaid termination discussion on August 17, 2020, Plaintiff received a formal "corrective action" identifying various reasons for termination.

51.     Any objective person would completely agree that the rationale therein was fabricated, as 1st) Defendant so pretextually terminated Plaintiff that documentation identified tasks Plaintiff was not even responsible for as part of her job; 2nd ) there were allegations Plaintiff's team was unhappy with her, which contradicted recent reviews, surveys, texts and feedback; and 3rd), no prior warning (verbal or in writing) was ever conveyed to Plaintiff about anything.

52.     Prior to the issuance of this "corrective action" memorializing Plaintiff's termination, Plaintiff's performance was stellar, timely and thorough – as evidenced by reviews and compensation growth.

53.     As stated, Plaintiff did not receive progressive discipline, as anyone not being retaliated against would.

54.     Plaintiff was only one (1) of several other Recruitment Delivery Managers or similar roles in the Talent Department, including but not limited to: (i) Colleen (Col) Holmes ("Recruitment Programs Manager"): (ii) Michael DeSanto ("Recruitment Delivery Manager"); (iii) Rick Carsley ("Recruitment Delivery Manager"); (iv) Amy Haggblom ("Recruitment Delivery Manager"); and (v) Christopher Selders ("Interim Recruitment Delivery Manager").

55.     Each Recruitment Delivery Manager had a number of Recruiters or Senior Recruiters who reported to them; in particular, Plaintiff had at least five (5) different Recruiters/Senior Recruiters reporting to her at all times.

56.     Given Plaintiff's work ethic and ability to handle her own team members and workload, Plaintiff was tasked with overseeing several additional Recruiters (in addition to her own) during a peer's paternity leave.

57.     Recruiters and Senior Recruiters often provided feedback about their direct supervisors and same was often solicited; never once was Plaintiff informed of any negative feedback from her Recruiters which was anything beyond what the company defined as "coaching and development" (which was common in the Ikea organization).

58.     In fact – in the midst of the "Tattar investigation," which prompted uncertainty about reporting functions, having an "interim" Manager in Tattar's absence, an going global restructure referred to as the "Lead Work Organize" (LWO) initiative, and pressure to focus on recruiting efforts for retail locations, many Recruiters were dissatisfied with their respective workloads and had expressed to Plaintiff and Plaintiff's peers their dissatisfaction with varying facets of the work environment in light of these considerations.

59.     These concerns were brought directly to upper management by Plaintiff, or some of her peers (to such an extent that the interim manager admitted there were too many emails on the issue and urged in person meetings to address these recruiter and manager concerns in real time).

60.     The concerns were not directed toward Plaintiff, her workplace demeanor, her handling of job duties or anything of the sort.

61.     If any single Recruiter brought any legitimate concerns to upper management's attention, Plaintiff was never told of it, had no opportunity to explain/explore any such complaint, and was clearly singled out for an arbitrary termination where numerous other managers in her same position had been the direct subject of criticisms by their own Recruiters for an array of reasons in the midst of very chaotic changes (ongoing) in this Talent Department.

62.     Carsley in particular was the subject of complaints by not only direct reports, but peers (in addition to outright discrimination complaints recently brought to management's attention by Plaintiff, an external candidate and likely Tattar).

63.     Tattar has since filed her own EEOC Charge against Defendant Ikea and identified *therein* that Carsley was formally coached for more than five (5) months and placed on a Final Written Warning – yet he was not terminated by Defendant Ikea for any of his actions.

64.     There is simply no question Defendant terminated Plaintiff for her own complaints of discrimination, for being a potential witness in Tattar's legal assertions (as she was sent a litigation-hold document while employed as to her), and solely for retaliatory reasons.

65.     As a final point, in addition to blatantly targeting Plaintiff for "investigation" the day after she pursued a formal discrimination complaint with iSpeak and fired her shortly thereafter (only presenting alleged "performance concerns" to her *after* termination), Defendant Ikea has a pattern and practice of retaliating against its employees and terminated at least two (2) other employees in the same time frame who came forward with complaints of formal discrimination.

## COUNT I
## Violation of Title VII of the Civil Rights Act of 1964 ("Title VII")
### (Retaliation for Complaining of Gender & Pregnancy Discrimination; Hostile Work Environment; Gender Discrimination)

66.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

67.     Plaintiff engaged in protected conduct under Title VII on several occasions in relation to Carsley during his hire, but most recently on June 8, 2020, July 14, 2020, July 15, 2020 and July 22, 2020.

68.     Plaintiff was subject to materially adverse actions very shortly thereafter, including being placed on an involuntarily leave of absence, having her workplace privileges and online access suspended, and being terminated.

69.     Plaintiff was terminated for objectively false and pre-textual reasons, and in contraventions of Defendant's own internal policies and procedures adhering to progressive discipline.

70.     Plaintiff was terminated for alleged performance/behavior issues for which male employees have not been terminated and was treated disparately in comparison to other male peers.

71.     Plaintiff was subject to regular and pervasive gender based harassment, in the form of unwelcomed advances by Carsley, comments about her appearance, and regular negative comments about women in general.

72.     Though Plaintiff escalated Carsley's inappropriate and repeated conduct and comments within Defendant, his behavior continued

73.     These actions as aforesaid constitute violations of Title VII.

**COUNT II**
**Violations of the Age Discrimination in Employment Act ("ADEA")**
**(Retaliation for Complaining of Age Discrimination)**

74.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

75.     Plaintiff engaged in protected conduct under the ADEA on several occasions in relation to Carsley during his hire, but most recently on June 8, 2020, July 14, 2020, July 15, 2020 and July 22, 2020, as she opposed his age based discrimination by Carsley.

76.     Plaintiff was subject to materially adverse actions shortly thereafter, including being placed on an involuntarily leave of absence, having her workplace privileges and online access suspended, and being terminated.

77.     Plaintiff was terminated for objectively false and pretextual reasons, and in contraventions of Defendant's own internal policies and procedures adhering to progressive discipline.

13

**COUNT III**
**Violations of the Americans with Disabilities Act, as amended ("ADA")**
**(Actual/Perceived/Record of Disability Discrimination)**

78.     The foregoing paragraphs are incorporated herein by reference as though set forth in full.

79.     Plaintiff suffers from a qualifying disability as that term is defined by the ADA, as amended, as her depression substantially limits her ability to think, concentrate, and sleep at times (though she was always able to perform her job well with Defendant).

80.     Plaintiff expressly put Defendant on notice of her record of depression and ongoing need for treatment.

81.     In close proximity to Plaintiff's disclosure of her record of a mental-health disability, she was terminated for completely false and pre-textual reasons.

82.     Plaintiff therefore avers that her disability was also a determinative factor in Defendant's decision to arbitrarily terminate her employment.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.      Defendants are to promulgate and adhere to a policy prohibiting discrimination and retaliation in the future against any employee(s);

B.      Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement and seniority;

C.      Plaintiff is to be awarded punitive damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their willful, deliberate, malicious and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

D.      Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper and appropriate (including but not limited to damages for emotional distress, pain, suffering and humiliation); and

E.      Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By:      _____

Ari R. Karpf, Esq.
3331 Street Rd.
Two Greenwood Square, Suite 128
Bensalem, PA 19020
(215) 639-0801

Dated:  March 11, 2021

15

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Katie Wagner | : | CIVIL ACTION |
| v. | : | |
| Ikea North American Services, LLC d/b/a Ikea | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255. ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks. (X)

| | | |
|---|---|---|
| 3/11/2021 | | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 639-0801 | (215) 639-4970 | akarpf@karpf-law.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Clv. 660) 10/02

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: 217 Mountain Street, Philadelphia, PA 19148

Address of Defendant: 420 Alan Road, Conshohocken, PA 19428

Place of Accident, Incident or Transaction: Defendant's place of business

---

**RELATED CASE, IF ANY:**

Case Number: _____    Judge: _____    Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1.  Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes ☐    No ☒

2.  Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?    Yes ☐    No ☒

3.  Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?    Yes ☐    No ☒

4.  Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?    Yes ☐    No ☒

I certify that, to my knowledge, the within case ☐ is / ☒ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 3/11/2021 _____    _____    ARK2484 / 91538

*Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.    Federal Question Cases:**

☐    1.   Indemnity Contract, Marine Contract, and All Other Contracts
☐    2.   FELA
☐    3.   Jones Act-Personal Injury
☐    4.   Antitrust
☐    5.   Patent
☐    6.   Labor-Management Relations
☒    7.   Civil Rights
☐    8.   Habeas Corpus
☐    9.   Securities Act(s) Cases
☐    10.  Social Security Review Cases
☐    11.  All other Federal Question Cases
          *(Please specify):* _____

**B.    Diversity Jurisdiction Cases:**

☐    1.   Insurance Contract and Other Contracts
☐    2.   Airplane Personal Injury
☐    3.   Assault, Defamation
☐    4.   Marine Personal Injury
☐    5.   Motor Vehicle Personal Injury
☐    6.   Other Personal Injury *(Please specify):* _____
☐    7.   Products Liability
☐    8.   Products Liability – Asbestos
☐    9.   All other Diversity Cases
          *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, Ari R. Karpf _____, counsel of record *or* pro se plaintiff, do hereby certify:

☒    Pursuant to Local Civil Rule 53.2, § 3(c ) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐    Relief other than monetary damages is sought.

DATE: 3/11/2021 _____    _____    ARK2484 / 91538

*Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

JS 44   (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| WAGNER, KATIE | IKEA NORTH AMERICAN SERVICES, LLC D/B/A IKEA |
| **(b)**  County of Residence of First Listed Plaintiff   Philadelphia <br> *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant   Montgomery <br> *(IN U.S. PLAINTIFF CASES ONLY)* <br> NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF <br> THE TRACT OF LAND INVOLVED. |
| **(c)**  Attorneys *(Firm Name, Address, and Telephone Number)* <br> Karpf, Karpf & Cerutti, P.C.; 3331 Street Road, Two Greenwood Square, <br> Suite 128, Bensalem, PA 19020; (215) 639-0801; akarpf@karpf-law.com | Attorneys *(If Known)* |

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

1  U.S. Government
   Plaintiff

**X** 3  Federal Question
   *(U.S. Government Not a Party)*

2  U.S. Government
   Defendant

4  Diversity
   *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place <br> of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place <br> of Business In Another State | 5 | 5 |
| Citizen or Subject of a <br> Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance <br> 120 Marine <br> 130 Miller Act <br> 140 Negotiable Instrument <br> 150 Recovery of Overpayment <br> & Enforcement of Judgment <br> 151 Medicare Act <br> 152 Recovery of Defaulted <br> Student Loans <br> (Excludes Veterans) <br> 153 Recovery of Overpayment <br> of Veteran's Benefits <br> 160 Stockholders' Suits <br> 190 Other Contract <br> 195 Contract Product Liability <br> 196 Franchise | **PERSONAL INJURY** <br> 310 Airplane <br> 315 Airplane Product <br> Liability <br> 320 Assault, Libel & <br> Slander <br> 330 Federal Employers' <br> Liability <br> 340 Marine <br> 345 Marine Product <br> Liability <br> 350 Motor Vehicle <br> 355 Motor Vehicle <br> Product Liability <br> 360 Other Personal <br> Injury <br> 362 Personal Injury - <br> Medical Malpractice | **PERSONAL INJURY** <br> 365 Personal Injury - <br> Product Liability <br> 367 Health Care/ <br> Pharmaceutical <br> Personal Injury <br> Product Liability <br> 368 Asbestos Personal <br> Injury Product <br> Liability <br> **PERSONAL PROPERTY** <br> 370 Other Fraud <br> 371 Truth in Lending <br> 380 Other Personal <br> Property Damage <br> 385 Property Damage <br> Product Liability | 625 Drug Related Seizure <br> of Property 21 USC 881 <br> 690 Other | 422 Appeal 28 USC 158 <br> 423 Withdrawal <br> 28 USC 157 <br><br> **PROPERTY RIGHTS** <br> 820 Copyrights <br> 830 Patent <br> 835 Patent - Abbreviated <br> New Drug Application <br> 840 Trademark <br><br> **SOCIAL SECURITY** <br> 861 HIA (1395ff) <br> 862 Black Lung (923) <br> 863 DIWC/DIWW (405(g)) <br> 864 SSID Title XVI <br> 865 RSI (405(g)) | 375 False Claims Act <br> 376 Qui Tam (31 USC <br> 3729(a)) <br> 400 State Reapportionment <br> 410 Antitrust <br> 430 Banks and Banking <br> 450 Commerce <br> 460 Deportation <br> 470 Racketeer Influenced and <br> Corrupt Organizations <br> 480 Consumer Credit <br> 490 Cable/Sat TV <br> 850 Securities/Commodities/ <br> Exchange <br> 890 Other Statutory Actions <br> 891 Agricultural Acts <br> 893 Environmental Matters <br> 895 Freedom of Information <br> Act |
| **REAL PROPERTY** <br> 210 Land Condemnation <br> 220 Foreclosure <br> 230 Rent Lease & Ejectment <br> 240 Torts to Land <br> 245 Tort Product Liability <br> 290 All Other Real Property | **CIVIL RIGHTS** <br> 440 Other Civil Rights <br> 441 Voting <br> **X** 442 Employment <br> 443 Housing/ <br> Accommodations <br> 445 Amer. w/Disabilities - <br> Employment <br> 446 Amer. w/Disabilities - <br> Other <br> 448 Education | **PRISONER PETITIONS** <br> **Habeas Corpus:** <br> 463 Alien Detainee <br> 510 Motions to Vacate <br> Sentence <br> 530 General <br> 535 Death Penalty <br> **Other:** <br> 540 Mandamus & Other <br> 550 Civil Rights <br> 555 Prison Condition <br> 560 Civil Detainee - <br> Conditions of <br> Confinement | **LABOR** <br> 710 Fair Labor Standards <br> Act <br> 720 Labor/Management <br> Relations <br> 740 Railway Labor Act <br> 751 Family and Medical <br> Leave Act <br> 790 Other Labor Litigation <br> 791 Employee Retirement <br> Income Security Act <br><br> **IMMIGRATION** <br> 462 Naturalization Application <br> 465 Other Immigration <br> Actions | **FEDERAL TAX SUITS** <br> 870 Taxes (U.S. Plaintiff <br> or Defendant) <br> 871 IRS—Third Party <br> 26 USC 7609 | 896 Arbitration <br> 899 Administrative Procedure <br> Act/Review or Appeal of <br> Agency Decision <br> 950 Constitutionality of <br> State Statutes |

## V.  ORIGIN *(Place an "X" in One Box Only)*

**X** 1  Original
   Proceeding

2  Removed from
   State Court

3  Remanded from
   Appellate Court

4  Reinstated or
   Reopened

5  Transferred from
   Another District
   *(specify)*

6  Multidistrict
   Litigation -
   Transfer

8  Multidistrict
   Litigation -
   Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title VII (42USC2000); ADEA (29USC621); ADA (42USC12101)
Brief description of cause:
Violations of Title VII, ADEA, ADA and the PA Human Relations Act.

| VII.  REQUESTED IN <br> COMPLAINT: | CHECK IF THIS IS A **CLASS ACTION** <br> UNDER RULE 23, F.R.Cv.P. | DEMAND $ | CHECK YES only if demanded in complaint: <br> JURY DEMAND:      **X** Yes      No |
|---|---|---|---|

| VIII.  RELATED CASE(S) <br> IF ANY | *(See instructions):* | JUDGE | DOCKET NUMBER |
|---|---|---|---|

DATE
3/11/2021

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

| Print | Save As... | Reset |
|---|---|---|